Filed 4/22/15  P. v. Barker CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B254529 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA373378) |
| v. | |
| KIANA BARKER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Modified and affirmed with directions.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Victoria B. Wilson, Supervising Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted Kiana Barker of murder, assault on a child causing death, and child abuse. She appeals, and we modify and affirm with directions regarding Barker's sentence.

## BACKGROUND

An information filed January 4, 2011 alleged that on March 4, 2010, Barker murdered two-year-old Viola V. in violation of Penal Code[1] section 187, subdivision (a) (count 1); between March 3, 2010 and March 4, 2010, Barker assaulted a child (Viola),[2] causing death, in violation of section 273ab (count 2); and between March 3, 2010 and March 4, 2010, Barker committed child abuse likely to produce great bodily harm and death against Viola, in violation of section 273a, subdivision (a). As to the murder count (count 1), the information alleged that Barker personally inflicted great bodily injury against Viola. (§ 12022.7, subd. (a).) As to the child abuse count, the information alleged that under circumstances likely to produce great bodily harm or death, Barker willfully inflicted unjustifiable pain or injury on Viola, resulting in death. (§ 12022.95.) As to all three counts, the information alleged that Barker personally used a deadly weapon, a belt. (§ 12022, subd. (b)(1).) The information also charged codefendant James DeWitt Julian with being an accessory after the fact in violation of section 32 (count 4), and alleged that Julian had two prior convictions of a serious or violent felony.[3] Barker pleaded not guilty.

**Prosecution case**

Olivia V. testified that she gave birth to Viola on April 2, 2007. When Viola was two days old, she was taken from Olivia V. at the hospital, because Olivia V. was not taking her medication (Seroquel). Olivia V. had stopped because she was not sure what the effect would be on Viola. Olivia V. knew Barker from church when they were young and when Barker was pregnant with her first child. Olivia V. asked Barker to take Viola,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] We refer to the child victim by her first name for ease and clarity of reference.

[3] Julian entered a plea, and is not a party to this appeal.

and she did. After Olivia V. started taking her medication regularly, Viola was returned to her two weeks later. Viola was again removed from Olivia V.'s care a year and a half later and was placed with Barker, again at Olivia V.'s request. Viola had sickle cell trait, but not diabetes.

**Emergency, police, and medical personnel**

Fire Captain Ronald Harmon testified that on March 4, 2010, he responded to a call to go to Barker's home on East Gage Avenue in Los Angeles, arriving at 2:21 p.m. Barker's boyfriend flagged him down. Once inside, Captain Harmon saw a little girl on the living room floor, lying lifeless on her back on a blanket. Barker was standing next to the child, talking on the phone to a 911 dispatcher. Captain Harmon could not find a pulse and the child was not breathing. He asked what happened, and Barker replied that "the baby must have choked on apple juice." He asked how long the baby had been down, and Barker's boyfriend said 20 minutes; Barker said, "'Not 20. It hasn't been 20 minutes.'" Captain Harmon rolled the baby over and saw bruising on the left side of her back and the left hip. Her skin was very cool.

Firefighter Michael Pagliuso was on the call, and saw that the baby wasn't breathing. He heard Barker and her boyfriend say that the baby had been drinking apple juice. He and another paramedic did cardiopulmonary resuscitation (CPR) on the baby until the ambulance arrived two minutes later. He carried the baby to the gurney, and paramedics continued the CPR while he drove the ambulance to the hospital. Barker rode with him in the front seat. Barker's demeanor was "very cold . . . not very worried," but nervous. Barker did not cry, but asked several times, "'Is she going to be OK?'"

The paramedics took Viola into the emergency room and laid her on a gurney, where Dr. Joshua Partnow shined a light into her eyes and saw they were fixed and dilated, which was a bad sign. She did not have a pulse and was not breathing. After 45 minutes of CPR and the insertion of a breathing tube, he managed to get a faint heartbeat. As he worked on Viola he saw a lot of bruising, so he called the trauma doctor for backup. Dr. Partnow asked Barker what happened to the baby, and she said Viola had not been acting normally that day and had slept late. He later asked Barker about the

3

bruising. Barker told him that Viola had gotten stuck between the mattress and a bed railing, but denied any other trauma. Dr. Partnow suspected child abuse.

Dr. David Duarte, a staff surgeon on call for trauma, came down to the emergency room and saw Dr. Partnow performing CPR on Viola. Dr. Partnow told him he had been able to get a little heartbeat. Dr. Duarte took Viola to the operating room, and opened up Viola's chest to massage her heart, which started to beat but then arrested several times. He saw swelling and bruising on her left hip and her buttocks, consistent with child abuse. Viola never stabilized, and Dr. Duarte pronounced her dead at 4:26 p.m.

Los Angeles Police Department (LAPD) Officer Gabriel Lopez had been called out to the hospital and asked Barker what had happened. Barker said Viola hadn't been feeling that well, so she fed her, put her down for a nap, and lay down with her for about five minutes. Barker then left the room. When she returned five minutes later Viola wasn't breathing, and Barker called 911. Officer Lopez thought Barker was "pretty calm . . . ." "[U]nder the circumstances, I would expect someone to be a little more, I don't know, distraught."

Dr. James Ribe, the coroner, testified that he did an autopsy of Viola on March 6, 2010. She was two years old, 34 inches tall, and 35 pounds. His opinion was that she died from blunt force trauma, meaning blows inflicted by an adult, along with internal bleeding, blood loss, and fluid loss. Viola had a large contusion on her right armpit and shoulder and several abrasions on her left hip area. Bruises appeared on Viola's chest and right hip. She had multiple small white scars he believed were caused by burns from a small, very hot object such as a match. Her buttocks were swollen and red, and there were bruises on the back of her right leg and on the front of her left hip, as well as three scabbed abrasions on her left lower back area. To produce the deep tissue bleeding he saw in Viola's buttocks, an adult would have to strike Viola with "the most they're capable of with their arm." The scabbed injuries would have occurred at least a few hours before Viola's death, possibly longer. The abrasion on her left flank was very recent and had the pattern of a shoe mark, consistent with someone kicking Viola with a

4

shod foot. There was also a double red mark on Viola's left lower abdomen or groin which looked like a pinch mark or a mark from a stick.

The blow to Viola's armpit was the result of very severe force, and had caused blood to collect in the chest cavity around her lung. As a result of the blood loss into her chest, Viola would have gone into shock rapidly, which meant her blood stopped circulating, and her brain ceased functioning as well as her heart and other vital organs, contributing to her death. The injuries to her buttocks also contributed significantly to Viola's death, with bleeding and fluid loss severe enough to impair her circulation and make her more vulnerable to dying from the chest injury. The armpit injury occurred very close to her death, because the rapid bleeding "takes a few minutes to kill." The injuries to her buttocks occurred anywhere from a half hour to 24 hours before her heart stopped, although it was more likely that they happened from a half hour to four hours before.

Viola's injuries could not have been accidentally caused, as the marks were in multiple areas of the body and came from different directions, and were not consistent with being stuck between metal railings of a bed or being freed with a hammer. Nothing that occurred in the emergency room or operating room would have caused her injuries. Viola appeared otherwise healthy except for some evidence of sickle cell trait, which would make her more vulnerable to the effects of soft tissue injury, stress, and blood loss. Dr. Ribe's opinion was that the cause of death was homicide.

Pediatrician Dr. Carol Berkowitz was certified as an expert in trauma in children. She had reviewed Viola's file. Viola was a healthy two and a half year old who, when she arrived at the hospital, was in full cardiac arrest. After reviewing the medical records and the autopsy report, Dr. Berkowitz's opinion was that Viola suffered extensive trauma and hemorrhagic shock. She showed signs of blunt force trauma consistent with kicking, hitting, or striking with an object. Viola's buttocks showed signs of multiple blows. Dr. Berkowitz believed her death was caused by child abuse. Bed railings could not have caused her injuries. Dr. Berkowitz did not see a pattern consistent with a belt buckle or a hammer.

5

**Barker's daughter K.**

Barker's daughter K., nine years old at the time of Viola's death, testified that in 2010 she lived in Barker's house with Barker, Barker's boyfriend Julian, Julian's son James, and Viola. She and Viola shared a bedroom and slept in bunkbeds, with Viola on the bottom bunk. A bed with railings was across the hall in James's room where Viola used to sleep, but K. had no memory of Viola getting stuck in that bed. Viola was pretty well-behaved, but if she threw a tantrum Barker would discipline her with a "bop in the hand. That's it." When K. misbehaved, she "would get whooped" by Barker, who used a belt on her buttocks.

March 3, 2010 felt like a normal day to K., who went to school and when she came back, went into the kitchen to make noodles for herself and Viola, who seemed happy and healthy. K. played with Viola before they went to bed at 7:00 p.m. or 8:00 p.m. The next day, March 4, Viola was asleep when K. left for school, which was normal. When she got home from school, Viola was gone.

Right after Viola died, Barker told K. not to say certain things to the police. After K. talked to the police the day Viola died, Barker yelled at her, saying, "'I told you not to say nothing to these people.'" Barker was upset that K. told the police that Julian and James lived in Barker's house, and told K. that was why she could not come back to live with Barker.

Julian had "anger issues," but Barker did not. K. had not talked to her mother about her testimony; she loved Barker and wanted to help her. She remembered that she had told the detective that she felt safer when Julian was around. A section of K.'s interview with the detective was played for the jury.

**Barker's friend Valerie M.**

Valerie M. died before trial and therefore was unavailable as a witness under Evidence Code section 240, subdivision (a)(3), so her testimony from the preliminary hearing in December 2010 was read in court. Valerie M. testified that she was friendly with Julian and Barker, and had known Barker for more than 10 years. On March 3, 2010, Barker picked her up and took her to her house, where Julian was out back in his

"man house" with someone named Leon. Barker and Valerie M. were drinking hard alcohol in the house, and Valerie M. was "faded," but was "still together." Around 3:00 p.m. or 4:00 p.m., Viola "got a whooping, but that wasn't no ordinary whooping." Barker , who was busy around the house, looked into Viola's room, got upset, and said, "'I'm tired of this shit,'" "'I can't handle this,'" and "'[w]here's James.'" Barker picked up something like a man's construction belt; Valerie M. grabbed her by the arm, but Barker told her to let it go or she would use it on her. Barker went into Viola's room, and Valerie M. heard a beating "like with that belt" ("plau, plau, plau, plau, plau, plau, plau, plau") and heard Viola crying until she gasped to get her breath. The beating went on "too long." She heard Barker yell "'get your ass up there'" and then a boom, like a swing against a wall. Valerie M. tried to get into the room but Barker had her feet against the door. Valerie M. told her "that's too much, quit," and said she was going to get Julian.

Valerie M. ran outside to get Julian, and told him he needed to go inside right now; he laughed. Finally she convinced him to go in. She pointed to Viola's room, and Julian went in and picked up Barker from behind. Julian carried Barker, who was furious and sweating, back to their room. Valerie M. crept into Viola's room and saw her on her bed, not moving much. Julian asked Barker, "'What did she [Viola] do?'" and told Valerie M. she had to leave, but Barker said, "'She's not going anywhere. And will go when I take her.'" Several hours later Barker drove Valerie M. home and apologized for what had happened, saying, "'I'm sorry you had to be there to see that.'" Barker called later to ask if Valerie M. was all right.

When Barker got out of jail, she and Julian visited Valerie M., and Barker told her Viola "'passed the next day after I whooped her.'" Barker told Valerie M. the police would come to talk to her, and Barker wanted her not to mention the "whooping." Barker said Viola died because she had diabetes, had a seizure after she had some Similac, and Barker had given her the wrong medicine. Viola's bruises were from her seizure on the floor. Julian then came into the room and said to Barker, "'Baby, let's forget this. You know, you ain't got to talk to her about nothing because when it comes down to it, if she winds up involved in this, we involved in, she going to come up missing, she . . . say

7

something wrong about me or her."' Valerie M. took this as a threat that if she talked to the police, something would happen to her. Barker then said, "'No, it ain't like that.'" Valerie M. thought Viola had died at least in part from the beating, which Julian had taken as a joke, and it wasn't funny: "That's a two-year-old girl."

Valerie M. denied any romantic interest in Barker. She had never before seen Barker behave the way she did on the day she beat Viola. The memory of that day had haunted Valerie M. ever since Barker told her that Viola had died.

**Detective DeHesa**

LAPD Detective Calvin DeHesa was the investigating officer. He went to the hospital on March 4, 2010, and spoke with Barker and her daughter K. K. had told him that Julian was protective and she felt safe around him; she mentioned no anger issues with Julian.

When Detective DeHesa interviewed Barker at the hospital on March 4, she had just learned that Viola was dead. Her demeanor was "pretty calm," concerned rather than upset. A tape recording of the interview was played to the jury. Barker told Detective DeHesa that Julian did not live with her although he had spent the night "when we were together." She explained that the day before Viola died, her lower torso got stuck in the bed railings. Barker used a hammer with a blue or grey grip to break some of the railings to free Viola. Viola got a few scratches from the metal, and Barker might have hit her in the buttocks. Barker threw the bed out in a lot nearby that same day. Barker said, "I'm trying not to cry," and Detective DeHesa told her it was okay to cry.

On the morning of March 4 Viola woke up late, around 10:00 a.m. She seemed tired and was not her usual "jolly" self. Barker was cleaning house to get ready for her monthly inspection by the Department of Children and Family Services (DCFS), and gave Viola a burrito and some Pedialyte mixed with water. Because Viola did not seem to be feeling well, Barker lay down with her for a while. She got up to clean some more, and on her way back to check on Viola she called Julian. When she got to the bedroom Viola was not breathing. Barker tried CPR. Viola spit up food and water, tried to breathe, and "just stopped." Barker told Julian (who was on his way over) that Viola

8

wasn't breathing, and then called 911. When Detective DeHesa told her that Viola had significant bruising, Barker said, "They'll blame it on me with the railing."

Later that day Detective DeHesa did a walkthrough of Barker's home with Barker, a recording of which was also played for the jury. The bed she had thrown out in the alley was no longer there, and the hammer she showed him was yellow. No belt was found. At the end of the recording, Barker said, "I know that I'm the prime suspect, but we all have to wait on the autopsy report to come back . . . I'll be that prime suspect until y'all find out what happened to her cause I know how it work. Y'all don't have to blow smoke up my pipe. This is reality." On March 9, Barker was arrested and was released two days later. She was arrested again on July 15, 2010.

**Defense case**

After being advised of her right to remain silent, Barker testified that she had been providing foster care since 2005. She knew Viola's biological mother, Olivia V., and had fostered Viola twice. Viola was a lovable, smiling child who was a little delayed, and had been helped by therapy. Olivia V. had weekend visitation. Baker was in the process of adopting Viola, and was close to finalizing the adoption.

Barker and Julian had a child who was six months old at the time of Viola's death. One of the foster care rules was that anyone with "unexcusable felonies" could not be in the household, and she believed Julian had felony convictions. Julian was living with her in March 2010, and she knew she wasn't supposed to have him in the house. Julian could be violent and once choked her with a phone cord, and she was afraid of him.

Barker had been friends with Valerie M. for 10 years. Valerie M. had a romantic interest in Barker and wanted to be with her, but Barker told her, "I'm not that way." A few months after Viola died, Valerie M. was at Barker's house and she and Julian started to argue. Barker and Julian took her home, where her boyfriend also argued with Julian. Valerie M. called Barker two weeks later and told Barker that she had ruined her life.

On March 3, 2010, Barker was cleaning the house in preparation for the DCFS inspection. Viola got stuck in the bed rails and Barker got her out and treated her scratches. Barker threw the railings in the vacant lot nearby where people often threw

9

things out.  On March 4, 2010 while the doctors were working on Viola at the hospital, Julian arrived and told her to stop asking what was wrong.  He sat her down in a chair and told her to remember the railing incident, and from then on she kept quiet and didn't tell Detective DeHesa about Julian's abuse of her.  Barker didn't know what had happened to Viola.

Barker acknowledged that she did not show emotion during the 911 call and the ride to the hospital, and explained that she did not express her emotions because of two traumatic incidents when she was eleven.  Barker admitted she had used a child's belt to hit K. on the hand and buttocks.  She had grown up with corporal punishment although she was not proud of that, and she had never used it on Viola.  In her phone conversation with K., Barker had been angry with K. because K. had told the authorities that Julian was living with them, and Barker had been lying to DCFS and saying that he did not.  She understood that having Julian stay at her house would prevent her from having a foster care license.

When Viola woke up on March 4, 2010 around 10:00 a.m., Barker turned on the television in Viola's room.  She continued to clean for the DCFS inspection, checking now and then on Viola, who looked as if she didn't feel well.  Barker took Viola into the dining room and gave her some Pedialyte and a burrito.  Julian was out back working in the yard and coming in occasionally.  Barker went outside for about an hour to put some things into storage, and when she came back in Julian and Viola were sitting at a children's table in the dining room.  Julian told her Viola threw up, and Viola was crying, so Barker thought she was sick.  She took Viola back into her room, pulled the blanket out and spread it on the floor, and lay down with her for a while.  When she went back into the dining room to clean up the vomit, she heard Viola make a sound like "unnnn, unnnn."  Barker returned to the bedroom and picked Viola up; her head lolled back and her eyes were rolling.  Barker called to Viola and ran to get ammonia for her nose, but she didn't move.  Viola had stopped breathing and Barker started CPR, continuing for some minutes.  Viola spit up some Pedialyte and Barker heard gurgling, but that was all. She screamed for Viola to talk to her.

10

After a few minutes, Julian came into Viola's room and Barker called 911. She dragged Viola into the living room on the blanket and followed the 911 dispatcher's directions until the paramedics arrived.

Barker agreed she did not seem emotional during her testimony, but she felt emotional. The small marks on Viola's body were not burns but places where Viola scratched herself and made a sore. The photographs shown at trial were the first time she saw the bruises on Viola.

On cross-examination, Barker stated she would spank Viola on her hand but had done so only once or twice. Julian had lived with her about a year; she married him after her release from jail in March 2010, but he had disappeared. She had told no one about the time Julian choked her with a phone cord. Barker denied telling the paramedics that Viola choked on apple juice, as Viola had only Pedialyte that morning. She had not told the officers that Julian was in the house. She admitted that although she told Valerie M. that Viola had had a diabetic fit, Viola did not have diabetes. Barker had not told the paramedics and hospital staff everything that happened that day because things were moving so fast.

**Closing argument**

In closing, the prosecutor argued that Barker was trying to blame Julian by testifying for the first time at trial that he was in the house the day Viola died, although she had told Detective DeHesa that she called Julian before she called 911, so Julian was not in the house.

Defense counsel argued (among many other issues) that the evidence pointed toward Julian. Barker did not tell the police that Julian was in the house on March 4, because as a convicted felon he was not supposed to be there. Counsel argued that it was unnecessary to show the witnesses and the jury Barker's "mug shot," and her perceived lack of appropriate emotion meant nothing regarding her guilt or innocence. The evidence showed that Viola's injuries were from recent trauma, not from the day before when Valerie M. was there, and were not from a belt and buckle.

11

**Verdict and sentencing**

After deliberating for less than a day, the jury convicted Barker on count 1 (murder), count 2 (assault on a child causing death), and count 3 (child abuse). The jury found true as to count 1 that Barker inflicted great bodily injury upon Viola, and found not true as to counts 1 and 2 the allegation that she used a deadly or dangerous weapon (the belt). On count 3 the jury found true the deadly weapon allegation and the allegation that Barker willfully inflicted unjustifiable pain or injury on Viola, resulting in death.

Barker made a motion to appoint new counsel to file a motion for a new trial based on ineffective assistance of counsel, which the court denied after a hearing. On February 21, 2014, the trial court sentenced Barker to 25 years to life on count 2, with the sentences on counts 1 and 3 stayed pursuant to section 654. She filed this timely appeal.

## DISCUSSION

### I. Admission of booking photograph

Before trial began, People's exhibit 4, a booking photograph of Barker taken on the day of her arrest, was admitted into evidence over defense objection. Defense counsel argued that the photograph had no probative value and considerable prejudicial effect, as it showed Barker "scowling": "We know what booking photographs often are. Miss Barker is sitting right here. There's no reason . . . to identify her here." The prosecutor argued that Barker looked substantially different today (four and a half years later in October 2013), and the booking photograph had probative value as to her appearance at the time of Viola's death on March 4, 2010.[4]

The court agreed with the prosecutor, stating that the difference between the photograph and Barker's appearance at trial was substantial, and the photograph had probative value as to how she looked at the time of the incident. As for prejudicial effect, "no one takes a happy picture when taking a booking photograph," and Barker was not

---

[4] There is no date on the photograph, but given the line of questioning regarding how Barker looked around March 4, 2010, we presume that the booking photograph was taken when Barker was first arrested on March 9, 2010, rather than when she was arrested a second time on July 15, 2010.

12

scowling, instead looking displeased that a booking photograph was being taken. The photograph was not inflammatory.

Defense counsel countered that the prosecution would argue that Barker was angry when she physically punished Viola and the photograph was consistent with how someone would look when they were angry. The defense might try to portray Barker otherwise. The court observed that today Barker did look quite different, and defense counsel again argued that her former appearance had no probative value. The court stated that her appearance in the photograph was important and had probative value: "It shows what a person is. That is the first impression that everyone gives." Barker looked different now, and the photograph allowed the jury to see what she looked like at the time of the offense; that was probative and not outweighed by prejudice. The court overruled the defense objection, and the photograph was admitted into evidence.

At trial, the prosecution showed the booking photograph to Fire Captain Harmon, who said he was not really sure if on March 4, 2010, Barker looked more like the photograph than the way she looked today. Firefighter Pagliuso and Officer Lopez both testified that on March 4, 2010, Barker looked more like she did in the photograph. Detective DeHesa stated that on March 4, 2010 Barker looked like the booking photograph, and he estimated she had weighed around 190 pounds. Now she appeared to weigh less. No prosecution witness mentioned her facial expression in the photograph.

The defense case opened with trial counsel asking Barker about the photograph, whether she now looked different, and why she had a scowl on her face. Barker testified that she had lost weight since the photograph was taken. When the photograph was taken, Detective DeHesa had just told her she was being charged with murder. She was going through a lot of emotions, was not feeling well, and was upset and confused.

In closing, the prosecution did not mention the booking photograph. Defense counsel argued that "very few people look innocent in a mug shot even if they are in fact innocent," and urged the jury to ignore the "old prosecution device" of repeatedly showing a booking photograph.

13

We have examined the booking photograph, in which Barker looks directly at the camera and appears angry.

Barker argues that any difference between her booking photograph and her appearance during trial was irrelevant, as her identity was not in issue. Respondent argues that the photograph was relevant to show "a more precise account of the size differential between [Barker] and Viola," to help the jury understand how much force Barker could inflict on Viola. The photograph had some relevance to show Barker's size was at the time of Viola's death, when Detective DeHesa testified she weighed around 190 pounds. Nothing in the record shows us Barker as she appeared at trial, and we accept the trial court's observation that she looked quite different.

Barker argues that under Evidence Code section 352, any probative value was outweighed by prejudice, as multiple witnesses (Firefighter Pagliuso, Officer Lopez, and Detective DeHesa) testified that she showed little emotion throughout the events of March 4, 2010. In the booking photograph, taken five days later when Barker was arrested, Barker does show emotion to the extent that she looks angry. How this prejudices her is unclear. The photograph does appear to show Barker looking angry rather than grief-stricken. Nevertheless, the photograph is related to the current offense and is thus unlike unrelated prior booking photographs, which "carry the inevitable implication that appellant suffered previous arrests and perhaps convictions," and "may well be equivalent to the introduction of direct evidence of prior criminal conduct." (*People v. Vindiola* (1979) 96 Cal.App.3d 370, 384.)

We review the court's admission of the booking photograph for an abuse of discretion, reversing only if the court ruled arbitrarily, absurdly, or capriciously. (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 966.) Evidence Code section 352 provides that the court has discretion to exclude evidence if the probative value is "substantially outweighed" by its unduly prejudicial effect. "'Prejudice' as contemplated by section 352 is not so sweeping to include any evidence the opponent finds inconvenient. . . . The code speaks in terms of *undue* prejudice." (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.) The photograph was relevant to show Barker's size on March 9, five days after

Viola died, and was not unduly prejudicial. The trial court did not abuse its discretion when it admitted the booking photograph into evidence.

Barker also argues that the introduction of inflammatory and irrelevant evidence violated her right to due process. As we conclude that the booking photograph was neither inflammatory nor irrelevant, we reject her constitutional claim.

## II.     Ineffective assistance of counsel

To prevail on her claim that trial counsel provided ineffective assistance, Barker must first demonstrate that "'counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms.'" (*People v. Ledesma* (1987) 43 Cal.3d 171, 216.) Second, Barker must show prejudice resulting from counsel's inadequate performance, that is, a reasonable probability that the outcome of the trial would have been different. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) We presume that counsel's performance was within the wide range of reasonableness, and that counsel's actions can be explained as a matter of trial strategy. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) On direct appeal, we "'"will reverse convictions . . . on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical basis for [his or her] act or omission."'" (*People v. Lucas*, *supra*, 12 Cal.4th at p. 436.)

### A.     Barker's custody status

During cross-examination, the prosecutor asked Barker if she had been arrested for Viola's murder on July 15, 2010, and she answered yes. The prosecutor continued: "And since then you've had a lot of time to think about your testimony, haven't you?" Barker answered yes. Barker also admitted this was the first time she had claimed that Julian was at the house the morning of the day Viola died.[5]

---

[5] The prosecutor asked whether "this is the first time that we hear that [Julian] was at the house the morning of March the 3rd, 2010," but the context of the continued questioning (regarding whether Barker had mentioned Julian's presence to the 911 operator, the firefighters, the doctors at the hospital, Officer Lopez, and Detective DeHesa) makes it clear that the prosecutor was referring to the morning of March 4, 2010.

15

On redirect, defense counsel asked, "[The prosecutor] asked you whether you had a lot of time to think about your testimony. Are you presently in custody right now?" Barker answered yes. Counsel asked if it was in the Los Angeles County jail, and Barker answered yes. Counsel then asked, "Have you been thinking—when did you make the decision to testify?" Barker responded, "Once I heard how the situation was misconstrued, I felt that I had to clarify." There was no subsequent mention of her custody status.

Repeated reminders of a defendant's incarceration without her consent may negatively influence a jury. For example, when a defendant is required against her will to wear jail clothing throughout trial, "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." (*Estelle v. Williams* (1976) 425 U.S. 501, 504–505 [96 S.Ct. 1691, 48 L.Ed.2d 126].) Nevertheless, "instances frequently arise where a defendant prefers to stand trial before his peers in prison garments. . . . [I]t is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury." (*Id.* at p. 508.) In *People v. Williams* (1991) 228 Cal.App.3d 146, 151, the court rejected a claim of ineffective assistance when defense counsel failed to object to the defendant's appearance in prison clothing: "[I]t is reasonable to presume trial counsel evaluated the strengths and weaknesses of the case and concluded having appellant appear in jail clothing would gain him needed sympathy from the jury." When an attorney decides based on the circumstances of the case not to invoke the defendant's right to appear in ordinary clothing, "courts should be reluctant to interfere with that decision because an attorney may waive his client's rights as to matters involving trial tactics." (*People v. Taylor* (1982) 31 Cal.3d 488, 496.)

Barker chose to appear in civilian clothing so there was no constant visual reminder of her incarceration. Nothing in the trial record explains why Barker's counsel chose to ask the question that elicited Barker's custody status. "'''[If] the record on

16

appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.) The prosecutor had just elicited that Barker had a lot of time to think about her testimony, and only now was Barker claiming Julian was present on the morning of the day Viola died, implying that Barker had, after long contemplation, fabricated a story that would inculpate Julian. After hearing the prosecution's cross-examination, defense counsel might have made a tactical decision to have Barker testify she was in custody "right now" and had only recently decided to testify after hearing the evidence at trial, instead of making up her story over time. In addition, just as defense counsel may occasionally decide for tactical reasons to have the defendant appear in jail clothing (and thus constantly remind the jury of the defendant's custody status), counsel may have wished to gain some sympathy from the jury. While we do not have enough information to discern counsel's reasons, we do not conclude that there could be no satisfactory explanation for his questioning.

In any event, Barker has not shown that she was prejudiced by her own reference to her custody status. The jury was fully aware that Barker had been arrested in May 2010 for Viola's murder, released two days later, and rearrested in July 2010. There was no indication that she had been in custody ever since until trial in October 2013. Although counsel expressly asked Barker if she was in custody "right now" and she answered in the affirmative, "an isolated comment that the defendant is in custody simply does not create the potential for the impairment of the presumption of innocence that might arise were such information *repeatedly* conveyed to the jury." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1336.) There were no further references to her custody status and we will not presume the jury was adversely influenced. Given the strength of the evidence against Barker, especially Viola's severe injuries during her care and Valerie M.'s damning testimony that Barker beat Viola severely the day before she died,

17

we see no reasonable probability that the jury would have acquitted Barker if she had not been asked about her custody status.

### B. Plea negotiations

Barker argues that her trial counsel was ineffective during plea negotiations when he did not show her the photographs of Viola's injuries and thus failed to adequately show her the risks of going to trial.

Before jury selection, the trial court stated that Barker had offered to settle the case for a 15-year determinate sentence, and the prosecution countered with an offer of 15 years to life with a guilty plea to second degree murder. Barker had been brought into court to discuss the offer and was given an opportunity to speak to her grandmother. She stated that she had had sufficient time to think about it, had conferred with her counsel, and wanted to take the prosecution's offer. The court stated that Barker's maximum sentence was 26 years to life in state prison; explained that the 15-year-to-life sentence meant that once she finished the 15-year term she might not be released and might serve a life term; informed her of her constitutional rights, which she waived; and detailed the other consequences of a guilty plea. After telling Barker that she would be on parole for life with conditions such as no travel outside the county, the court commented: "You're giving me sort of a quizzical look. Is this new information for you?" and Barker answered, "Yes." After Barker conferred with her counsel for a half-hour, the court stated that it had discussed the case with both counsel to better understand whether Barker was entering the plea voluntarily, and asked Barker whether she had any questions. Barker replied, "I want to change my mind. I want to go to trial." After the court advised Barker that it would not accept a change of mind after jury selection was underway, she conferred again with counsel, who then informed the court that her decision was to go to trial.

Barker points out that she testified that she had decided to take the stand when she "was able to see photos and find out information about what took place. I didn't know all of that information." Defense counsel asked, "In other words, had you—had I shown you those photos before?" and Barker answered no. She now argues that without having seen

18

the photographs before rejecting the plea offer, she could not adequately evaluate the risk she would face at trial, given the extent to which the photographs corroborated Mann's testimony that Barker beat Viola severely on the day before Viola died.

The right to effective assistance of counsel extends to the negotiation and consideration of plea offers. (*Missouri v. Frye* (2012) 566 U.S. ___ [132 S.Ct. 1399, 1405–1407, 182 L.Ed.2d 615].) "Defense counsel has a duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," and it was ineffective assistance when counsel "allowed the offer to expire without advising the defendant or allowing him to consider it" and the defendant later accepted a less favorable offer. (*Id.* at p. 1408.) A defendant can show prejudice by demonstrating a reasonable probability that he or she would have accepted the plea offer, and that there was a reasonable probability the plea would have been implemented. (*Id.* at p. 1409.) In *Lafler v. Cooper* (2012) 566 U.S. ___ [132 S.Ct. 1376, 182 L.Ed.2d 398], decided the same day, the Supreme Court found counsel ineffective where "all parties agree the performance of respondent's counsel was deficient when he advised respondent to reject the plea offer on the grounds he could not be convicted at trial." (*Id.* at p. 1384.) Defense counsel had advised the defendant that the prosecution would be unable to establish his intent to murder the victim, because she had been shot below the waist. (*Id.* at p. 1383.) Even if his trial was fair, the defendant was prejudiced where he received a minimum sentence three and a half times greater than was offered him under the plea. (*Id.* at p. 1386.)

It is not in dispute that Barker's counsel did not show her the photographs of Viola's injuries before trial. Yet Barker was present at the preliminary hearing, where she was represented by trial counsel, and heard testimony describing the extent of Viola's injuries. Dr. Partnow, the emergency room physician, testified that Viola's body had a "very large surprising amount of bruising to her left and right hip and the inner aspect of her right bicep extending up into her armpit" and "bruising around the buttocks," and the sight of the injuries made him think she had suffered a traumatic event. Dr. Ribe, the coroner, testified that he saw eight blunt force injuries in different areas when he

19

performed the autopsy. There was a large amount of hemorrhage, swelling, and bleeding in the buttocks tissue. His opinion was that Viola's death from blunt force trauma "definitely was caused by child physical abuse." Dr. Ribe also testified that the injuries to the buttocks could have been inflicted up to 24 hours before Viola died. There was a large pool of blood in Viola's chest from other injuries that occurred while she was still alive. It was possible that Viola could have died from the buttocks injuries alone. Her "very, very significant pain" would have contributed to her going into shock, which was the cause of her death. This testimony certainly informed Barker of the medical evidence regarding Viola's extensive and severe injuries, alerting her to the likely testimony of the doctors at trial and the concomitant effect on the jury. Counsel knew Barker had heard the testimony and could reasonably have concluded that Barker was already aware of the extent of the injuries without the photographs. We note that Barker does not argue that she was not aware that there were photographs or even that photographs would be shown at trial, nor does she argue that she was unaware of any other evidence. Barker has not demonstrated that simply because counsel did not show her the photographs of those fully described injuries during plea discussions, she was unaware of the strength of the evidence and its likely impact on the jury.

Even if the failure to show her the photographs during plea negotiations did constitute deficient performance, Barker has the burden to show prejudice, meaning that if counsel had shown her the photographs, there is a reasonable probability that she would have accepted the plea offer and the lower sentence. Without having seen them, she initially accepted the plea offer and then withdrew her acceptance after the court advised Barker of the consequences of a plea, including that she still could serve a life sentence and would in any event be on probation for life, and prohibited from leaving the county. The court noted that Barker looked quizzical, and Barker said this was new information to her. After conferring with counsel, she rejected the plea offer. We do not think it is reasonably probable that the photographs, if shown to her after her initial acceptance of the plea offer, would have so changed her assessment of the case that she would not have changed her mind and gone to trial.

20

## C.    Julian's hearsay statement

Barker argues that counsel was ineffective in failing to request the redaction of Valerie M.'s testimony to eliminate as hearsay Julian's statement to Barker in Valerie M.'s kitchen, which Valerie M. believed was a threat:  "'Baby, let's forget this. You know, you ain't got to talk to her about nothing because when it comes down to it, if she winds up involved in this, we involved in, she going to come up missing, she say some—she say something wrong about me or her.'"  Barker responded, "'No, it ain't like that.'"

The statement was not hearsay at the preliminary hearing, as Julian was Barker's codefendant at that time and present in the courtroom.  (Evid. Code, § 1220.)  At trial, Julian was no longer a defendant and neither he nor Valerie M. was present at trial, and the jury was instructed not to speculate about the reasons for their absence.  The statement is thus hearsay.  Although there is no indication in the record of counsel's reasons not to object, we see an obvious tactical reason.  Barker's defense sought to make Julian responsible for Viola's death, and evidence that Julian made a threat against Valerie M. would bolster that theory and cast Julian as a violent person seeking to cover up his crime.  Allowing in Julian's statement allowed the jury to hear and understand Barker's immediate repudiation of his threat, which put Barker in a favorable light and further bolstered the defense theory that Julian, not Barker, was to blame.

We also see no prejudice.  Barker argues that the statement likely made the jurors believe that Valerie M. was unavailable because Julian had carried out his threat by eliminating her, and in turn the jury may also have believed that Barker had "caused the disappearance of" both Valerie M. and Julian.  We find it implausible that the jury would infer that Barker had eliminated both Valerie M. and Julian.  Further, the trial court instructed the jury not to speculate why either witness was unavailable, and we presume that the jury followed this instruction.  (*People v. Homick* (2012) 55 Cal.4th 816, 873.)

## D.    Barker's lack of emotion

Barker argues her counsel was ineffective when he "abandoned" efforts to explain why she appeared relatively emotionless on the day Viola died.  When Barker testified at

21

trial that she appeared emotionless because two traumatic incidents made it difficult for her to express emotion, the prosecutor objected that the testimony was not relevant. Out of the presence of the jury, defense counsel stated that Barker would testify that she was raped and physically abused by a family member. The court stated it needed to know more about the incidents. Counsel replied that Barker could tell the court the details. This irritated the trial court, which pointed out it was counsel's job to provide the information to the court. Counsel conferred with Barker and told the court that Barker had been kidnapped and raped by a family friend, and her mother had said it was Barker's fault; and when her mother was dying, Barker's older cousin had prevented Barker from going to see her mother because Barker was crying. The court asked additional questions, counsel was not sure of the answers, and at one point Barker interjected information. Counsel then stated that he had made a decision not to introduce the testimony about the incidents to avoid a "mini trial . . . . [¶] . . . [¶] I don't feel getting into that depth would even help my case at all." The court noted that the prosecution would want to explore the details of the incidents, and counsel stated he just wanted to move the trial forward. Counsel agreed to confine his questioning to whether "past incidents" in her life had made Barker an unexpressive person, and Barker's testimony resumed.

Counsel made a reasonable strategic decision not to examine Barker in detail about the incidents in her past, which would result in a "mini-trial." Further, Barker has shown no prejudice. In closing, defense counsel argued forcefully that the jury should not construe Barker's perceived lack of emotion as evidence of guilt. But the evidence against Barker was strong, and we do not believe the jury would have reached a different result had they heard more about events in Barker's past.

As we conclude that none of the individual issues identified by Barker constitute ineffective assistance, there was no defective performance overall. Finding no error on her other claims, we conclude that her trial was not fundamentally unfair.

22

### III. *Marsden*[6] motion

At the date set for sentencing, the court stated that defense counsel had advised it that Barker wanted to argue that counsel was ineffective at trial and she wanted a different appointed attorney. The court conducted a hearing pursuant to *Marsden*. Barker stated that exculpatory evidence was not introduced at trial. Her counsel stated that she likely referred to evidence presented by the previous prosecutor, mostly reports and other documents from DCFS. The pretrial judge had reviewed the documents and stated there were four or five relevant incidents, but they were inculpatory (involving physical punishment of foster children with a belt). Counsel had "looked over what was available," and concluded that the only useful information was that Barker had been engaged in providing foster care for some time. He had made a strategic decision not to use it.

Barker also stated that counsel had failed to call a witness who could have discredited Valerie M. Leon Knight, a family friend, would have testified that he had not been at Barker's home on May 3, 2010, in contradiction to Valerie M.'s testimony that "Leon" was in the backyard with Julian. Knight would testify that neither he nor she was there that day. Defense counsel explained that he had talked to Knight many times, and the theory was that Knight could have said that he did not remember Valerie M. coming into the backyard to get Julian. Knight, however, was not articulate, was very forgetful, "wasn't able to connect," and could not have placed himself at the house the day before Viola died. Counsel also stated that Knight had hung up when counsel called to ask him to testify, and in any event counsel felt Knight was uncooperative and had he appeared in court, he might have inculpated Barker.

Finally, Barker stated that counsel never sat down with her to prepare, she knew nothing about what would happen at trial, and counsel had not talked to her about potential witnesses or expert witnesses. The court reminded Barker that it had initially refused to allow the plea offer but had relented, and Barker ultimately decided she did not

---

[6] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

want it and wished to go to trial. Barker had never stated that she needed more time or that defense counsel had not gone over the case with her. In the court's view, her counsel had argued the case very well and done as well as possible. Defense counsel stated that he had hired an expert, who had told him "you don't want to call me [the expert] as a witness." The evidence regarding the bed railing was weak, so counsel felt in the face of the medical evidence his best choice was to argue that someone else killed Viola. Counsel averred there were earlier plea discussions, and the prosecution only made the 15-to-life offer on the eve of trial; if he had rushed Barker, "that is what I had to deal with at that time." He had visited with Barker at least 20 times over the three years of her detainment.

The court concluded that Barker had not shown that any of her complaints about trial counsel were substantial, and stated, "I don't believe that anyone else could have done better than what he did." The court denied Barker's motion to replace trial counsel with different appointed counsel.

When a defendant claims ineffective representation by appointed counsel and asks the court to substitute another appointed attorney, the trial court must allow the defendant to explain his request and state specific reasons why current counsel is not providing adequate representation. (*Marsden*, *supra*, 2 Cal.3d at pp. 123–124.) A defendant is entitled to a substitute appointed lawyer if, during an ensuing *Marsden* hearing, he "makes a showing . . . that his right to counsel has been ""'substantially impaired.'"" (*People v. Sanchez* (2011) 53 Cal.4th 80, 90.) We review the trial court's denial of the motion for an abuse of discretion. (*People v. Taylor* (2010) 48 Cal.4th 574, 599.)

First, trial counsel made a tactical decision not to use the evidence Barker complains was lacking at trial, because it was in the main inculpatory. Second, Knight's purported testimony, as described by Barker, was internally contradictory. If Knight was not at Barker's house on March 3, 2010 he could not testify that Valerie M. was not there or that she had not come into the backyard to get Julian. Counsel judged Knight to be an inarticulate and forgetful witness, and made a legitimate tactical decision that calling him would merely disadvantage Barker. Third, counsel stated at the hearing that he had hired

24

an expert who advised counsel the expert's testimony would hurt Barker; he had made an earlier plea offer, which was rejected, and had to deal with the last offer at the last minute just before trial; and he had visited Barker at least 20 times. Barker did not demonstrate that her right to counsel was substantially impaired. Counsel provided legitimate tactical reasons for his trial decisions. The trial court's decision to deny the motion was not an abuse of discretion.

As to the other issues Barker raises regarding her counsel's performance, she did not raise them at the hearing, and they are therefore forfeited.

## IV.    Sentencing issues

The trial court imposed a sentence of 15 years to life with a possibility of parole on count 1, noting that Barker was not eligible for probation because the jury found the great bodily injury enhancement true. Respondent correctly points out that the great bodily injury enhancement on count 1 (murder) should have been stricken, as section 12022.7, subdivision (g) states that the enhancement "shall not apply to murder or manslaughter." "'We must give effect to this plain language.'" (*People v. Cook* (2015) 60 Cal.4th 922, 933, 938.) Therefore, the jury's true finding on the great bodily injury enhancement to count 1 must be stricken and the trial court must resentence Barker on count 1 without the enhancement.

Respondent also states that a criminal conviction assessment of $30 should have been imposed on each count. The court imposed the fee only as to one count, presumably count 2. Government Code section 70373 states that an assessment fee of $30 "shall be imposed on every conviction for a criminal offense." Although the court stayed the sentences on counts 1 and 3 under section 654, mandatory fees must be imposed even if a sentence is stayed. (*People v. Crittle* (2007) 154 Cal.App.4th 368, 370–371.) When a fee or penalty is mandatory, we may "properly correct[] the trial court's omission of [such fees or penalties] even though the People raised the issue for the first time on appeal." (*People v. Talibdeen* (2002) 27 Cal.4th 1151, 1157.) The trial court was required to impose the $30 assessment on each of the three counts of conviction.

## DISPOSITION

The jury's true finding that Kiana Barker inflicted great bodily injury in connection with committing murder in count 1 is stricken. The matter is remanded for resentencing on count 1. Upon resentencing, the trial court shall impose a $30 criminal conviction assessment fee on each of the three counts of conviction. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

CHANEY, Acting P. J.

BENDIX, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.